Good morning. May it please the Court. My name is Larry Steinberg, and it's my honor to represent Burnlounge and Juan Alexander Arnold here this morning. I've been trying to convince courts for the last seven years of the vibrancy and the legitimacy of Burnlounge and its products and its business model. And it's hard to show in a set of briefs. And we obviously did not convince the district court that these products were as valuable as the community of music fans thought they were, 60,000 people. So it's important, though, for this Court, particularly in the context of the legal analysis, which this Court is going to be asked to do under Cuscut and Omnitrition chiefly, to understand that this company was product-driven. And we're not challenging the factual findings of the Court. Judge Rule was clearly skeptical of the value of the products. And if I have time a little later in my argument, I'll address why I thought that his skepticism, though established as a factual matter for this appeal, is not really pertinent to the legal analysis. But in 2004, when Napster came... Let me ask you something, just natural curiosity. Are the folks back here some of the investors or some of the people involved? Yes, Your Honor. Not investors, Your Honor, but... I don't mean investors, but... My client, Mr. Arnold, is here. Mr. John Taylor is in the courtroom. He's representing himself. Mr. Arnold's family is here. There are some other people here who are... Not the folks in the right here. Well, Your Honor, I could go through and identify most of them for you. These are people who, seven years after the beginning of Byrne Lounge and five years after its demise, who have largely gone on to other business endeavors, feel strongly enough about what this company could have been to come here and seemingly try to explain to this court why this was not a pyramid, this was a legitimate multilevel marketing company, like some of the largest consumer products in this country, and why the district court, though well-intentioned, nobody could question the amount of care and time that Judge Wu took in crafting a decision. He just got the test wrong. He did not hold the Federal Trade Commission to its burden. And I'm sorry if I'm a little emotional about this, but the trial started five years ago next week. Counsel, could I interrupt? Forgive me, but your time is ticking, so I have a question. Thank you. You said a minute ago that you're not challenging the district court's factual finding. He made a lot of findings. Do you mean you're not challenging the finding about the value of the product? And then you said you might try to get to that later because you challenged his skepticism, but what factual finding are you not challenging? The court made findings that were clearly derogatory and skeptical, that the products were worth as much as Byrne Lounge was selling them for. So that's the value of the product. The answer to my question is yes. Yes. We do not challenge that finding. But in making that finding, Your Honor, the court made other findings regarding the value of the products, which we believe established that Byrne Lounge was not a pyramid. So, as my contrast professor used to say, I get it all except the therefore. The district court found that the products had some tangible value for some people, that they were not a sham, and that they were true products. The court also found that the vast majority of the moguls who bought the product packages were not interested in the product, which he did, I guess, by comparing it to the people who were not moguls and whether they bought this product. And so his point seemed to be it may have had some value, but that didn't account for the reason people were buying these products. It's not the products. My understanding is that we're not talking about the individual downloads. We're talking about these packages, which had some periodic downloads chosen for you and some other things like magazines and stuff. That's correct, Your Honor. We're talking about the product packages, which was no less a legitimate and important part of Byrne Lounge's product mix than the music downloads. The Federal Trade Commission, in its brief, on six different occasions calls music, Byrne Lounge's extensible products. That didn't come from Byrne Lounge. And, in fact, that's not what the district court found. The district court found that the product packages, which included a whole variety of things, Your Honor, Judge Barzani touched on some of them. There are others. The court found that those products were people who bought for the purpose of the products, that those products had tangible value. But we submit that that turns the cost of the test upside down. Logically, Your Honor, there are three possibilities here. Somebody would join Byrne Lounge and buy a product package exclusively for the products. One logical possibility. Would buy exclusively for the business opportunity and have no interest whatsoever in the products. Or the most likely scenario, and there's no evidence on this in the record, no evidence put forth by the FTC. The most likely scenario are people would have some interest in some of the products and possibly some interest in the business opportunity. Well, what Costco requires, in order to prove an illegal pyramid, is that the commissions need to be paid for sales unrelated to products, the sale of products to ultimate consumers. Well, there's no question here that everyone that bought a Byrne Lounge product package was an ultimate consumer. Most of the cases that were cited by both sides in the briefs, including especially arm nutrition, are inventory loading cases where there are sales to a middleman and then a second sale, theoretically, to an ultimate consumer. So, the court in Cotney, the FTC decision in Costco, and the court in arm nutrition and other of the inventory loading cases, and Amway, which is a very important case in this lineage, were understandably concerned because the first half of the sale to the middleman would take place. The multilevel marketing company would pay a commission. Nothing per se wrong with that. But then there would be no safeguards to make sure the second sale to the consumer took place. And that's what Costco and arm nutrition were concerned about, and that's what Amway addressed. But that's not a problem with Byrne Lounge because the district court found, and there's no evidence in the record and there's no contention, that the product packages which Byrne Lounge sold were not sold to the ultimate consumer. They were not intended for resale. That's a better way of saying it. They were sold once. There was no evidence in the record that any Byrne Lounge participant bought more than a single product package. So, the second piece of the Costco formulation of the test to the ultimate consumer, that really falls out of this case to Byrne Lounge's benefit. But in order to get certain benefits qua retailer, they have to buy these product packages. It's a simple question with a complicated answer, Your Honor. Are you talking about someone who wants to participate in the business opportunities that we're addressing? Yes. Okay. In order to participate in the business opportunity, a Byrne Lounge participant needed to do two things. Well, more than two, but two initials. The two initial things they needed to do was buy one of the three product packages, any one of them. Right. If you buy the higher ones, you get fewer commissions. Wrong. Easier. Well, I said wrong too quickly. I'm sorry. Easier was we definitely disagree with, and that's one of the errors that the district court made, and that was pointed out in our Rule 59 motion. But as far as larger commissions. You said a 25 or something. To the extent that Byrne Lounge was paying higher commissions when more expensive products were being sold, that's a correct statement, Judge Berzon. How is that different than what Judge Berzon just asked you? Because you did not qualify by buying the most expensive package, the VIP package for $429. You did not, for most of the time that Byrne Lounge was in existence, qualify more easily for greater bonuses or commissions than if you had bought the basic or the exclusive package. The fact of the matter is to get in the game, to be a participant entitled to be paid commissions, any one of the products would have sufficed. And the fact of the matter is if we also talk about buying and selling, Your Honor. You asked about buying. My answer addressed selling, which is actually a more informative way of looking at the question. If I'm a Byrne Lounge participant and I sell a VIP package, the most expensive package, I'm going to get a bigger commission. And that's no different than any sales company that's going to pay larger commissions on the sale of more expensive products. And the fact of the matter is every multi-level marketing company in this country, and we're talking about companies like Herbalife and Melaleuca and Avon and Tupperware, they pay both on direct sales by the participants and also indirect sales by the participant's sales team, hence the pyramid, the geometry of the diagram. All that the district court found here is that, and this is a factual finding that we're stating completely lacked evidence. And the court acknowledged he had no evidence on this. All the court found is that the intent of most of the people who became moguls, most of those people's intent in making the purchase of the product package was in order to participate in the business opportunity. But the court ---- Was he wrong about that? Or was that a supportive finding? That finding is not supported by any evidence. And the court says that. If you look at the statement of decision, the court says that the intent of the product purchase is vital. The court then goes on and says that neither side presented any survey evidence or other evidence of what the intent was. So the court accurately puts out there this very key issue that, by the way, was the Federal Trade Commission's burden to prove this intent. The court puts out that issue and then says, neither side presented any evidence, so I'm going to jump into the breach, and I don't mean to be disrespectful to Judge Wood, but I'm going to jump into the breach and I'm going to decide it anyway without any evidence. And then he takes Dr. Vandernet's testimony, and we'll get to that in a moment. Why isn't that evidence? Why isn't that expert testimony evidence? Because all that Dr. Vandernet ---- Dr. Vandernet conceitedly did not present any actual evidence on the actual intent of the burn lounge participants. Dr. Vandernet admits that. Dr. Vandernet did not do any survey. He did not question any participants. He didn't examine any documents that speak directly to the intent. And what Dr. Vandernet did is do a geometrical theoretical model that said that, assuming that every person who became a mogul was interested in the business opportunity, anybody that was more than four levels down in geometry is not going to get their investments in the business opportunity back. That's not evidence, Your Honor. That's math. There's no evidence, and there's no contention by the FTC that there's any actual evidence in the record. What the FTC does is to ask inferences based on buying patterns. But what Judge Wu ---- Go back to the original. Finish what you're saying, and then we'll go on. I'm sorry. What the district court did is it took the test and reversed it. What the district court said is, I'm going to deem any sale illegitimate if any piece of that sale, any piece of the intent of that sale is related to the business opportunity. That's fair. Why wouldn't the logical test whether a sale would have occurred but for the business opportunity? That isn't to say that the person, you know, doesn't get and keep whatever the package is, but it's sort of, would this person have bought the package without the business opportunity? Your Honor, if there is a, taking my three logical possibilities here, there's a mixed motive. If somebody bought for both, I just want to make sure I understand Your Honor's question, that would be a legitimate sale. It would only be if the person exclusively purchased the product package only for the business opportunity. I'm not going to throw out the packages and I'll listen to the tapes and I'll read the magazine, but would I have bought this otherwise? No. That's not the COSCA test. If this court now wants to revisit that and if this court wants to establish a but-for test, that's not in the law right now. If the court has the benefit of an amicus brief that was filed by the Direct Sales Association, we found that brief to be very informative, not because, in fact, it does not support Byrne Lounge as a factual matter. It simply takes a view of the multilevel marketing industry, and what the DSA brief says is a company that's product-driven, where there's a demand curve and a robust supply and demand caused by the products, that's not an illegal pyramid. To take your honors, what I propose, what I'll deem to be a suggested new formulation of the pyramid test, because I think, you know, I recognize it's not in the case right now. If that's the way this court would like to describe it, we would submit, first of all, that is consistent with the case law, a but-for test. I would have bought the product package. Yes, no, maybe. But for the business opportunity. If that's the way the court would like to formulate the test, that would get to the policy behind shutting down illegal pyramids that are based not on the products, but simply on recruitment. And if the commission is... Wasn't it true? Well, two things, two factual things. First of all, you said earlier that there was, it didn't matter which package you'd bought. I thought that the record showed this, that if you had a basic mobile, basic package, you couldn't get a monetary bonus unless you sell $500 worth of music or $1,000 worth of music. If you have an executive package, you can get $20 or $50 if you sell $500 worth of music. If you have a VIP mobile, you get $50. Is that wrong? No, Your Honor. If I said that, I misspoke. Oh, yes, definitely. There was no distinction between the exclusive and the VIP packages. There were easier qualifications. On the one that I read, there seemed to be a difference. On November 1, 2006, there was a change in the policies and procedures to institute a lesser qualification requirement if you bought the higher package. But for the first year and a half of Byrne Lounge's existence, there was no difference between the second and third, the two most expensive packages. But Your Honor is correct with respect to the basic package. There were additional requirements to sell additional music. Second of all, wasn't it true that at the end of this process, and maybe because the litigation was coming up, they eliminated the need to buy the packages in order to get the bonuses and nobody bought the packages anymore? Your Honor, the district court acknowledged that just as likely an explanation for the fall off of sales was the fact that there was a lot of publicity about the Federal Trade Commission's accusing Byrne Lounge of being an illegal pyramid and also that Byrne Lounge, because of the asset freeze that the district court ordered, lacked the funds to operate its business. There's no finding in the record that it is only because of the pyramid element of the Byrne Lounge business model that the court found that sales dropped off. Sales did drop off. Your complaint is a lack of evidence claim. I mean, you're saying nobody proved that people didn't really want these packages. I'm saying that the court did not hold the FTC to its burden of proof and the FTC did not supply any evidence that the intent of most of the people buying the product packages was exclusively for the business opportunity. What the court found is that people in that middle category with a mixed motive had some interest in the business opportunity and somehow that changed the model. I only have a couple of minutes. You're talking about the damages issues. I'm sorry? About the restitution issues, the amounts of money there are. The fact that the court, the district court took its own approach that was not offered by either party to considering what it considered to be consumer harm. It did not give any credit whatsoever. More favorable to your client. Oh, no, Your Honor, much less favorable, because the court never established a value for the product packages and did not give any credit for the consumable, tangible value of the product packages. You think the court's calculation was less favorable than the FTC's? Oh, no, but it was certainly less favorable than ours. No, no, no. My comment was different. My comment was it was more favorable to your client than what the FTC. Yes, yes, yes. The FTC asked basically for gross revenues to be disgorged. Our view was that even if Burn Lounge was adjudicated to be a pyramid, that the only portion that was required to be invested to participate in the business opportunity were the basic package and the mogul fees. But what the court did that was error as a matter of law. So if your client's scheme had been, you know, business operation had been found to be a pyramid, you think the damages should have been measured how? I think that the court should have made a finding that in order to participate in the business opportunity, the requirement was that a basic package be purchased, $29.95, and then whatever the participants paid on the $6.95 mogul fees, and if my recollection is correct. Per month. Per month, yes. An average is set at 6.8 months per participant. If my recollection is correct, that came out to about $650,000. And you think that's the total amount of damages? That's the calculation I just described for your honor. The $29.95. That's it? The total damage that the court should have entered had your client been found to be a pyramid was $650,000. I think that's correct, Your Honor, yes. I know my time is, I think my time is up. I'd like to address for just a moment, please, the inadmissibility of Dr. Vandernet's testimony. Dr. Vandernet is a Ph.D. economist who works for the Federal Trade Commission. He testified for over two days at trial. He was clearly the FTC's chief and most important witness. Dr. Vandernet admitted in his testimony that he has his own test. He stated what it was, and he described it in the record. It's at 11 SCRs, page 73. How was his testimony? I recognize this argument. It's in your briefing, and I appreciate that. And he, just to try to conserve time, he did look at several factors that were characteristics, I'll say, of your client's business. But how was Dr. Vandernet's test different from the case law, our case law? Dr. Vandernet's test did not address whether or not the commissions were paid on sales unrelated to the sale of products to the ultimate consumer. That's what the test is. And when asked whether or not his own four-prong test would always create results consistent with the Costco test, he said he did not know, 70 ER, page 1031. Dr. Vandernet also admitted that he did not know whether a court applying the Costco test would always come up with the same result that he came up with in applying his test. And finally, and it was to us most shockingly, in his years of studying potential organizations that could possibly be accused of being an illegal pyramid, he never identified a single business model which he deemed to be a legal, multi-level marketing company. And when pressed to trial with some of the most common household names, are they legal or are they not, he would say he does not know. And under Daubert, if there is no possibility of testing the conclusion, of testing the error rate in the analysis, the testimony should not have been admitted. And the district court clearly took great deference to the opinion. The entire structure of the district court's opinion, and I'm talking about specifically 5 ER pages 53 to 50. I'm sorry, 43 to 50. That's seven pages of the district court's decision. Clearly mimic the structure and include the contents of Dr. Daubert's expert testimony which influences court. I'm sorry, Your Honor. It's not Dr. Daubert. Dr. Vandernet. Dr. Vandernet's testimony. Maybe Daubert was a doctor. I doubt it. Thank you very much. I met his son one day. He was an expert witness. I couldn't believe it. He said, my name's Daubert. I fell off the chair. Same guy? Son. Son. I didn't hear that, but that's okay. I just want to ask you this. Were any diagrams, I like diagrams, any diagrams introduced in evidence to describe your client's organizational sales structure? Is Your Honor asking about the commission system or something different? Well, you have the diagrams that describe what a pyramid structure looks like. And I understand that they can vary, but a diagram that describes the system involved in this case. There were two items that were in evidence that immediately come to mind in listening to Your Honor's question. The first diagram was a chart. In other words, if you were picking up the New York Times and you wanted to, you know, they're writing a story on this. They usually have a pretty good diagram. You can see where it happened, what happened, how it flows and all that. Your Honor, that diagram would look like a pyramid. I can't get away from the geometry of a multi-level marketing company. That diagram would include a whole series of sales representatives who signed up and recruited other sales representatives to form sales teams. And those sales teams generated product sales. Can you show the flow of the products? Well, that's actually a very important point, Your Honor. The products were not sold. The sales were engendered by the distributors. The products were actually sold by Burr Lounge. That's why there was no inventory issue. In many multi-level marketing companies that have been condemned and the kind that sort of raise headlines and people sort of raise their eyebrows at, people have to buy inventory every month and they stick it in their garage and that inventory is never resold. And the commissions are paid. Courts and agencies are deemed on the recruiting of those additional people. But in Burr Lounge, the sale of the products, if that's Your Honor's question, the sale of the products, actually it came through a website that a participant had. You would type your information in. But the product would come from Burr Lounge and it would be sold and shipped from a warehouse. So there was no distribution of products from the individual participants to the consumers. All of that was done. Why did that change anything? The only – well, first of all, I was responding – I was trying to respond to Jessica's question. But the importance of that from our perspective is because it shows there was no danger of inventory loading. It shows there was no danger of commissions being paid on products, which didn't have any reasonable likelihood of ending up in the hands of an ultimate consumer. Thank you. That's why it changes something. If I could just take a moment, please, to talk about Mr. Arnold. And I realize I'm over my time, and I apologize to the Court for that. Mr. Arnold has been adjudicated to be jointly and severally liable for the $16 million that Burr Lounge has been held to be responsible for. And we would submit that there is nothing in the record or in the district court's decision which meets the requirements of the Publishing Clearinghouse Test 104F31168. Specifically, what that test requires before a corporate officer can be held jointly and severally liable with a company is either actual knowledge that Burr Lounge was a pyramid or reckless indifference to whether or not Burr Lounge was a pyramid, or that he had an awareness of the high probability of a fraud. Why wouldn't either of the latter two prongs apply here? The reason is because there's no – well, what you have is Mr. Arnold is the CEO of Burr Lounge. You have Burr Lounge adjudicated a pyramid after two years of fierce litigation and a conceivably complicated set of facts, and you have nothing more than that. Dr. Vandernet, when asked in his testimony whether or not a consumer or a business person could have applied his test and could have told whether or not Burr Lounge was a pyramid, Dr. Vandernet replied that his analysis is so complicated and intricate that nobody without a Ph.D. in economics could actually apply his test and get to the result that it's a pyramid. The answer to my question is that even though I think there's evidence in the record that he conceived of Burr Lounge, not just that he was a CEO, but that he actually developed it. He was a controlling force behind Burr Lounge, and we don't dispute that. From his conception. Yes, from his conception. Okay. But you seem to be saying that even though he surely fully understood the business operation, that because it was so very complicated that he would not have appreciated the legal significance of it. No, it's more than that, Your Honor, and I realize that – And what is it, counsel, because you're way over time. Please. I need to hear your answer to this. Mr. Arnold's testimony was consistent with a product-driven company where commissions were paid on product sales, and if he was in error, it's without the scienter that's required under the public- He could have done this in good faith. He could have conceived of this business model in good faith, even though he fully understood that he may not have appreciated the legal consequence, may not have appreciated that it was unlawful. And most importantly – Yes. Yes. And most importantly for this court, there's no finding to the contrary made by Judge Wolk. But, of course, you just went off three prongs, and you seem to be suggesting now that there's an intent requirement as opposed to a reckless disregard requirement. No, there's no finding of reckless disregard, Your Honor. There's no finding of intent. There's no finding of an awareness of a high probability of fraud. What there is a finding of is that Mr. Arnold was the controlling force behind the design and implementation of a complicated business with tens of thousands of people that spent in excess of $5 million on its products and tried to implement what Burland believed was a legitimate business model. If Burland was wrong, well, then we lose, I guess. So he's part of this appeal, but that doesn't make Mr. Arnold's judgment as terribly liable. Thank you very much for the court's notice. Thank you. Thank you. Thanks for your patience with my question. May it please the Court, and good morning. Burke Kappeler for the Federal Trade Commission. I think it's worth reviewing a few of the facts that were established below to describe how Burland operated. Over the course of its lifetime, Burland sold more than $2.3 million in digital music and related merchandise. That was its ostensible retail product. That's what it told consumers it was in business to do. And yet, during the same time period, Burland made more than ten times that much money, over $25 million, selling packages. These packages are the... They just included music. They did, Your Honor. They included downloads and some other items. But as the district court found, those included items were of no value for the people who were buying them for the point of recruiting other moguls. And that's exactly why people bought these packages. How were they of no value? Because people were more interested in the business opportunity. And this, by the way, this whole issue... What does it mean they got no value out of the music? What does it mean they had no value? That doesn't mean they got no value out of the music. Your Honor, the district court's finding was that, in fact, there was no value to... Yes, but we're the court of appeal. Why is that right? Why is that right? Well, there were a number of factors to establish that there was no value. And this goes, I think, to the issue of the evidence of the record. So, for one, as Dr. Vandermath has testified, it's impossible to value items that were never sold independently. None of the items... And that's not true. It happens. There are other instances in which the same problem comes up, and there are ways to do estimates by looking at equivalent market. For example, CDs are sold... Or they had a CD, they had some magazines. I understand you might value them low because they might not be the magazines that anybody else... that are equivalent, as to which there's an exact equivalent, but to say there's no value... Well, Your Honor, first of all, Burnlodge attempted to make exactly that argument, and they put forward expert testimony to establish it. But you had the burden. That is true, Your Honor. And we met it in several different ways, actually. So, there is the point of Dr. Vandermath's testimony that it's impossible to value items. I thought one of the things he said was, I'm not a music person, I don't know, I can't really say. Right, but... That's not a very good argument for not being able to value it, the fact that we have the wrong person. Well, Your Honor, I think what Dr. Vandermath was getting at was that some of these... I think what he was getting at in saying that it's difficult to value something that has never been offered is that nobody ever could buy a single issue of Burnlodge magazine. So, whether that should be compared to Rolls and Stone or Set FX or the free magazine that I'm going to get on the airplane later this afternoon, there's no way to measure that, and I think that's what Dr. Vandermath was saying. But the more conclusive... So, there's no market value. There's no market value for these items. But the more conclusive point, I think, is the purchase pattern, the evidence of who was buying what. And this primarily comes out of Exhibit 422, tab 42 in the excerpts of record. And Judge Pregerson, you were asking for diagrams. If you'd like a diagram to show the effects of this operation, it's Exhibit 422. And what that diagram shows is that of the mobiles, of those who are interested in purchasing... those who are interested in receiving cash from Burnlodge, over 95% of them bought these packages. And, in fact, over 67% of them bought the most premium package that did offer the highest levels of bonuses to mobiles with the most minimal amount of out-of-sales. On the other hand, there was something less than 2,000... It was easier if you bought that expensive package to get bonuses. It was, Your Honor. That was Judge Pregerson's question about 20 minutes ago. That's right. And I think there was a little bit of confusion there because the answer that Judge Pregerson received confused what the trial court established with the arguments that Burnlodge made in its motion for reconsideration. At trial, what the district court looked at was Exhibits 8 and 10, which set up a plan by which there were different levels of bonuses for different packages. And Your Honor had it exactly right. If you bought the basic package, the bonus was zero unless you sold $500 or $1,000 worth of music. If you bought the exclusive, you started at $25. If you sold $500 worth of music, then you could get up to $50. But if you purchased the VIP package, the most expensive package, you were automatically at that $50 level from the start. And then if you then sold the VIP package, you would then generate points that would enable you to earn that $50 more quickly. So the issue here is that what Burnlodge has done in its bonus structure is to incentivize not music but package sales. If you look at Burnlodge's bonus programs, the way it compensated its salespeople, its moguls, of the three of them, two and a half are directly related to package sales. In other words, if you were a mogul and you wanted to make money, the last thing you would do is sell music. You would sell packages. That is the recruitment opportunity. And that's why this case runs afoul of Costco. Because the test of Costco is where you offer – well, in Costco, the definition of a pyramid scheme is where there's a right to sell a product and the right to receive rewards in exchange for recruiting others into the program, where those rewards are unrelated to salespeople and users. But how do we get there by valuing the packages at zero? Well, the fact that the packages are not worth anything undercuts Burnlodge's argument that somehow – What is the potential to your argument? Because your argument is that the cost of – the charges for the right to recruit and sell to others was not related to product, was that the product there is – you get a product, but the product's not worth anything. Your Honor, I think we would take a position that the included items that came with the recruitment packages were not products at all. But the more – I understand that. That seems so – maybe more than you need. Are you talking about the backstage cashes and that those weren't products? No, Your Honor. What does that mean? They didn't have any value? They didn't have any value. And the people who were buying the packages were not buying them for the product. Okay, but how do we know that? It's the purchase patterns that are in exhibit. Okay. And there's nothing else, right? There isn't any survey. Well, no, no. And Your Honor, I apologize for stepping over you. Sorry. There was direct evidence from the trial from four moguls that the FTC put on. Each of them testified that they purchased the VIP package or at least one of the premium packages and that they either saw no value or got no value out of the items that came with it. They saw the packages entirely as a business opportunity. To recruit other people and get cash back. And to make money in that regard. Okay, so let me ask you this then, counsel, because I don't understand this. But it may be that I'm misunderstanding the record. I think the FTC's calculation assumes that a mogul who paid $429 for a package and made $200 back, so he's underwater. Yes. Was harmed to the tune of $429. His entire investment or her entire investment was tallied as a damage. Is that right? I believe that's right, but I also... Why is that? How can that be right? Well, I believe, Your Honor, that there were... The idea, I think, is to force the burn lounge to disgorge the full amount of what it received. Well, yes, that would be one way to disgorge it. But I just don't know that there's an actual way to measure consumer harm. Right. Well, I think there is also evidence to the effect that... Well, excuse me. Actually, let me back up, Your Honor, because I can clarify this. What you're asking is, was there an offset for commissions received from burn lounge to the moguls? And the answer is that the district court did not include that in its calculation. Now, the FCC asks for it, and we ask for it because we start from the principle that a company or an individual that has been defrauded should be forced to disgorge all that they've gotten gained. But what the district court did... Without any deduction for overhead. Well, Your Honor, no, no. We look at receipts minus refunds, for instance, when we calculate disgorgement or equitable monetary relief. I'm not sure how this fits in, but let me let you finish first, and then I'll follow up. Well, the point I'm making, Your Honor, is that when the district court conducted its analysis and when it tallied the equitable monetary relief as it did, it did make an exception for commissions. Essentially, what it did is it said, I'm not going to count the mogul fees, the 695, that were paid to burn lounge from the moguls. But at the same time, it said, I'm not going to count the commissions paid from burn lounge back to the moguls because they're essentially awash. But that's different. I'm asking about the FTC, you know, Vandernath calculation. Yes, that's right. And like I said, we're asking for the full amount because we want to burn lounge to disgorge. Everything that is taken from consumers... But I don't understand how it has taken something that went and, in fact, paid it back. How is that taking it? Well, Your Honor, none of these moguls that we were seeking restitution or redress for had a net profit. They were all... They didn't have a net profit, but they didn't have the net loss you were claiming. Your Honor, all I can say is the idea is to... I don't see your idea. But the idea doesn't make any sense. If I've only been harmed in $200, I've only been harmed for $200. If you return $200 to me, then I only was harmed for $200, not for $400. Well, Your Honor, I think ultimately, though, what ended up happening... I mean, this may have been our position at trial, and this may have been the position that we sought. It's a position consistent with our position in other cases. Ultimately, the district court disagreed and chosen its discretion to do its own calculation, and that calculation came out to $16.2 million. We don't disagree and have no... And the way it accounted for the commissions was by the swash? Yes, Your Honor. It's note 47 of the district court's opinion. It describes how it handled the commissions. But more importantly, what the district court did is... And this gets back, I think, to Judge Christin's question of Burnlounge's counsel. It did provide Burnlounge a significant benefit of the doubt when he conducted his calculations, and not just because it picked a figure less than what the FTC may have done, but what the district court did in its calculations was it essentially provided to Burnlounge a discount to reflect the value or the perceived value that some people have received from the packages. In other words, your question about value is one that actually the district court picked up on and used in calculating its relief. But I don't understand how it did that. Go ahead. Same question. I know. I think you're... Yes. So the answer is what the district court did is it conducted a formula, essentially, for each price point of the packages. Again, there's the basic, there's the exclusive, and there's the VIP. And for each of those price points, it calculated a population of harmed moguls. Then it calculated, of course, the price of the package. And then it applied a discount rate. And that discount rate is based on that small population of non-moguls, the ones who didn't buy the business opportunity, but still bought the package. The bottom album. No. No, Your Honor. These are the ones who bought... Well, it depends because the district court applied a slightly different methodology at each price point. Okay. So don't forget what I just said. Just don't let me interrupt you then because this is important. Go ahead. Yes. So, and we can break this. We can be as granular about this as we need to be. You may need to be. Go ahead. All right. For the basic package, what the judge did is he looked at the percentage of non-moguls, people who did not buy or did not participate in the business opportunity. They're going to get music. They're just going to get music. Right. Some of them did buy a package, but most of them, 96% of them just bought music or albums or merchandise. Right. Of those, 31.4% bought one album. Right. And 3% bought a package without also participating in the business opportunity. And that is a point I'd like to focus on. Why do we care that they bought an album? I don't understand why that was very sticky news. I think what he was trying to get at, Your Honor, was people who saw some value in the basic package, but were not willing to take it. In the music? In the music. In the music that was in the package? Well, with the basic package, it did not provide the downloads of the music. Okay. So these are then people who are, they're non-moguls and they're people who are more likely to like music. I think that's exactly it. It would give some value to the package because they may actually be music lovers. Is that? I do believe the district court provides a little bit better reason as to why it picked that percentage. Where? Where? Court's indulgence, Your Honor. But to continue the analysis, it picked that. Essentially, it's an album purchase, Your Honor, and I think it's to reflect those who saw some value in Burn Lab and some value in music. Okay. And so you were just going to give me the where part? Oh, I'm sorry, Your Honor. It's in the district court statement of decision. Page. Court indulgence. I'm just hoping you're reading something that I haven't read. It's page 25 of the district court's decision, the ECF pages. We're looking at the same thing. We must be looking at the same thing, Your Honor. But the point is, I think what he was trying to do. Let's be more precise. So he took a percentage. How is a percentage an amount of money? Well, what he did, Your Honor, is he developed a percentage for each price point, and that percentage was intended to reflect individuals who purchased or wouldn't have purchased the package but did not participate in the business opportunity. He's not putting a value on the package. No, but what he's doing, Your Honor, is he's essentially using them as a proxy to say, here is somebody who must have wanted the items included with the package or they wouldn't have bought it. I don't like it. You're backing them out altogether. That doesn't make sense either. Well, that's what the district court did. So essentially what the district court did is it said, I'm establishing for each of these price points a percentage of people that I believe would have bought these packages for the included items. And then if you subtract that from 100%, you have the percentage. That's not putting a value on the item. Well, I think what he's doing then is he's giving these. I think what the district court is doing as part of his calculation is that he's essentially saying, for those people who bought the package but did not participate in the business opportunity, that the package was worth at least what they paid. Something. Something. Something. And that was then, I think your position then is that that's, if anything, perhaps overly generous. Well, Your Honor, we, yeah, well, I would say that the FCC would argue that that is overly generous because we started from a different point. Yeah, you are the FCC. Yeah, yeah. But you can go even further and we can take this a little bit more granular. Okay. In establishing some of these discount rates, the district court looked at the 2,000 or so moguls who bought a package but didn't buy the business opportunity. However, as you've already pointed out, there's something like 57,000 moguls who never even bought a package. So if you were to calculate these rates applying that population of non-moguls. Wait a minute. Did you just say 57,000 moguls who didn't buy a package? I thought they had to buy a package. I'm sorry. Your Honor. Now you're really giving me a headache. I know. I apologize. But they had to buy a package to be a mogul, right? They did. Let me back up. Non-moguls. So if Your Honors have, for instance, Exhibit 422 in front of you. Yeah. Okay. What I'm talking about are the population of moguls in Table 3. Okay. Or non-moguls. Again, I apologize. These are non-moguls, people who either bought no package at all or if they did buy a package, they didn't go on to buy, to participate in the business opportunity. If the district court had looked here and used this as the basis for calculating the discount rate, the percentage it was applying in the analysis on page 25, that award would have gone up significantly more. And that is where, that is why. One more time, and I don't know whether this is worth the effort, but what is this percentage of percentage of? In other words, he's taking a percentage of the non-moguls of what? Of the total number of non-moguls who bought that package? He said what he's looking at is he's looking at non-moguls who bought a package but then didn't take the next step to participate in the business opportunity. And he is saying this is evidence to show the people who would have valued this package. And then what? What's the percentage, though? A percentage of what? He said transposing a percentage onto the moguls. But what's the, where's the percentage coming from? Well, to give you an example, Your Honor, if you have Exhibit 4. Go ahead. So, for example, there were 17 of 2,000 or so non-moguls who purchased the package. Seventeen percent bought the highest level VIP. So, what the district court is saying. 17.3. 17.3, exactly. So, what the district court is saying is if we use that as a proxy, actually, then 82.7% of moguls, those participating in the business opportunity must have bought it just because they wanted the business opportunity. And that was the rate that it applied when it calculated the consumer harm for the purchases of the VIP package. I would like to, if I could, though, back up for just a moment because we're discussing values and percentages and so forth. But I want to back up because we're using these percentages to talk about the value of these included items. It's important to remember, though, that the value of the items included with the recruitment packages is irrelevant to the issue of whether Burn Lounge is a pyramid scheme. This was what Dr. Vandernat testified to during his testimony. And what he said was whether there's any value to these included items goes to the amount of harm. It goes to the net of what the consumer, the mogul, got from Burn Lounge. But it doesn't change the fact that Burn Lounge created a structure that rewarded recruitment of other moguls more than it rewarded the sales of digital music. And if you look at the statistics... But that's only when you turn the value of the package into zero. And you said that earlier. You started with that premise that, in fact, you don't consider the package to be a product at all. Well, that's true, Your Honor. But that's not... The Cost Cut Test is not asking about the value of the package as a product. The Cost Cut Test is asking what is a business doing to incentivize retail sales versus recruitment of other people? And there were greater incentives to recruit people. There were greater incentives to recruit people. If you look at the statistics of Burn Lounge's business operation... What does that dispute about what's just unrelated to product mean? Would you say that's not what's meant? You don't mean totally unrelated. It can be related, but it's a question of where the predominant incentive is. That seems to me to be what you're saying. That is correct, Your Honor. I think, in fact, during the trial, I think Dr. Van Hennet corrected Burn Lounge's counsel because they were trying to make the argument that it had to be completely unrelated. The question is about the legal issue. They're saying Dr. Van Hennet has a wrong standard because he isn't applying the legal standard. And they're quoting from some legal... some case law. Your Honor, the legal standard is the one that comes from Cost Cut. The test is whether the rewards for recruiting others are unrelated to sales ultimate use. But Cost Cut doesn't require it to be completely unrelated. Cost Cut does not use the adverb completely. And as we think about how to... But what you're saying is what it really means is whether the incentives predominate or something to that effect. Yes, Your Honor. Or are greater than the incentive to buy the product or something to that effect. Yes, Your Honor. Which is a revision of the language. No, we're not arguing for a revision of the language. This is the way the courts have applied this test. When you look at Cost Cut itself and then Amway and then this court's decision in on nutrition, what the courts are trying to do is trying to assess to what degree the business is incentivizing retail sales or to what degree it's incentivizing recruitment. And Amway is essentially the canary in a coal mine, if you will, for this. Because what it goes to show is that a business that operates in a multilevel way and yet has sufficient incentives to push its retailers to make external sales or to sell to external people is not a pyramid. As contrasted with on nutrition, this court's holding, which had similar procedures but didn't enforce them and allowed exceptions to them so that internal sales to participants could qualify as retail sales. In that case, as this court said, if Cost Cut's going to have any teeth, those sales to our other participants cannot qualify as retail sales. Do you agree that we don't... There was a lot of discussion in the briefs about this internal sales issue. It really hasn't come up today. Do you think that it's the notion that... You're not saying that these things weren't products because they were internal sales. You're just saying they weren't products because they weren't worth anything. Well, I'm saying they weren't products because they weren't worth anything and I'm saying they weren't products because people weren't buying them because they wanted the products. People were buying them because they wanted the packages they came with and they wanted those packages because they could make more money selling more of those packages than they could by selling music. That's what I'm saying. But if they had, for example, sold individual downloads to the people who were also... they were also recruiting to be recruiters, that wouldn't be a problem. The fact that they were... If they were buying them in the same percentages in the same way that people who weren't the moguls. Well, yes, I think that's correct and I want to be clear. I mean, what the FTC is not saying and no one has said this, is that internal consumption is illegal or somehow not permitted. It absolutely is permitted. The question, though, is are you taking that internal consumption and somehow treating it as an external retail sale and saying that for that reason this is a business that is relying on getting money from outside. That was the problem with Omnitrition because Omnitrition was saying that distributors who are buying things for themselves, just like the moguls in Burnlabs are buying things for themselves, it was nonetheless counting those sales as sales to ultimate users. But that wasn't a retail sale. That didn't leave the organization. It created a problem that every pyramid scheme has where you're relying on internal sales or internal consumption to keep money flowing. Ultimately, that collapses. So the issue here, the issue in Omnitrition and the issue here, is to what extent are you pushing your people to make retail sales? And the answer with Burnlabs is it wasn't. Well, other than sales. I don't understand anything, but I don't understand it. If somebody who thinks that this is a way to make some money and therefore buys these packages and so on becomes a mogul, also thinks, you know, rather than buying my downloads from iTunes, I think I'll buy them from Burnlabs. I don't understand why that's not as good as if some other person buys them from Burnlabs in terms of whether there's, in fact, retail sales going on. Well, Your Honor, I think I would say this. For that person, there were opportunities within Burnlabs. That person is probably one of the only 341 people who decided to buy the exclusive package and therefore received downloads, and hopefully they got their value for that. But if that person was one of the 17,000 who bought the exclusive package because they also hoped to make money from Burnlabs, they were sorely disappointed because mathematically speaking, 87.5% as a mathematical certainty, 87.5% of Burnlabs moguls would not make their money back. And the actual number, as we've said, and I'm sure you know, is closer to 94%. So, if you wanted the package, if you wanted the package for the package, and very few people did, but if you did, you have that option. If the problem is when it's then tied to a business opportunity, that is almost a guaranteed failure, and that's exactly what was happening there with Burnlabs. I'd like to, if I could, turn to Dr. Vandernat because he has come up and there have been some questions about his testimony. The district court was well within its discretion to have admitted Dr. Vandernat's testimony. He is the foremost pyramid scheme expert. He is a Ph.D. level economist. He has advanced graduate studies in mathematics. So, if you could get past qualifications and talk about the argument that, or respond if you would to the argument that he used a different test. Your Honor, I don't think Dr. Vandernat could have said more often that he was applying the Costco test and that what he was doing was looking at the evidence as to how you would apply the Costco test to Burnlabs. Now, again, remember the Costco test is a question of relation. It's a relation of retail sales to rewards. And what Dr. Vandernat looked at, the four factors are Burnlabs' terms and conditions, his promotional materials, the optimal scenario that he developed, and the actual sales data. In other words, Dr. Vandernat looked at... Burnlabs' sales data. Burnlabs' sales data. In other words, what Dr. Vandernat looked at was how it structured his program, what it said about the program, how the rewards work, and how the rewards are related to retail sales both in a theoretical way and in an actual practical way. So Dr. Vandernat's testimony goes directly to Costco. It is a direct interpretation of Costco. And, in fact, if this Court were to try to interpret Costco, I would imagine this Court would do a very similar analysis. What did they set up? What did they say about it? And how did it work? What about the fact that the Court felt a need to ascribe some value? I'm sorry, some value to the packages? Right. Which is not what Vandernat urged. And also for the bonuses. Well, Your Honor, again, I think this is a matter within the Court's factual finding. But I want to be clear about what that factual finding actually was. What it said is for those people who bought the packages in order for the business opportunity, in other words, the moguls, these included items had no value. And it said for this very small chunk of people, these 2,000 or so... It's a very strange object in a market economy when you're talking about value. It has no value to some people and value to other people. In other words, some people may want to buy it and some people may not want to buy it. But we usually think of market value as having some objective existence, not being completely subjective based on what an individual, as opposed to the market as a whole, wants to pay for it. Well, Your Honor, the District Court's comment was that one man's trash is another man's treasure. True, but that's not how a market operates. The market adds up the people who think it's trash and the people who think it's worth something and puts some objective overall value on it. Well, Your Honor, I think if you're looking for objective... I don't want to buy a Mercedes, but that doesn't mean it has no value. Well, no, Your Honor. I think, though, the point is, as far as the District Court goes, we're back to Table 1 at the top of Exhibit 422, because that is what shows, I think, that for some people these items had no value because they were not... What I'm trying to say is that is not the way a market economy works. The fact that some people don't want it doesn't mean it doesn't have value. I mean, there was value that went into making it to begin with. There was some added cost to begin with, and some people wanted it. So you would think that you could come up with some kind of an approximation of a market value on it. Well, Your Honor, I think we can do that. I mean, I think what the District Court was saying is that it has, again, no value for those people. Let me back up. I think what Your Honor is saying is clearly... They don't want it. As I was saying before, that doesn't mean they throw it in the garbage. I get contributions to certain organizations, and they send me magazines, right? Would I buy the magazines? No. Do I read the magazines? Yes. Does it maybe have a little something to do with why I've given contributions? Maybe. Well, Your Honor, I understand. I think what I'm hearing is almost a philosophical objection to the Court's sort of denial that these had any value. As I said, the Court said that for some folks... What I'm saying is he wasn't denying that they had any value. He was denying that these people wanted it. Well, I think, Your Honor, then... It's a different point. Well, then I think you get back to the purchase patterns, and I realize that sounds somewhat like a broken record. But when you have 60,000 people who purchase these packages in order to participate in the business opportunity, and you have 2,000 people, actually less than 2,000 people, who purchase the same packages, but don't participate in the business opportunity, it seems to suggest that why people, or at least the District Court found, that why people are purchasing the packages is not for the item. Is that the same question is what I'm asking? I'm asking you as a question whether this product has a market value. And is that the question? Is the requisite question whether it has a market value or whether this person subjectively cares about the market value? I don't think those are the same questions. Well, Your Honor, let me put it... I hear what you're saying, and I think what I would say is it does have a market value. But if we were going to value that market value, we would need to value it like this. For example, what is the value of the VIP package and the items that are included with it? For the VIP package, 342 people purchased that package without the associated business opportunity. 40,000 people bought it for the business opportunity. And approximately 56,000 people didn't buy that package at all. So you take approximately 58,000 people, none of whom wanted the VIP package. 341 of them did without the associated business opportunity. What is, therefore, the value of that package? Not very much. That's my point. But it's whether they paid the $6.95 a month or not. I'm sorry, Your Honor? The way we know the difference between those two categories of people is whether they also paid the $6.95 a month. Yes, Your Honor. That was the second point. I mean, it's possible that people thought, well, as long as I'm buying this package, I may as well buy the $6.95 a month and see if I can make some money out of it. But really, it's the package I want. How do you tell which one it is? Well, Your Honor, I would say that the majority, in this case, of participants clearly wanted that package for the business opportunity. I think that's right. And I think the answer to the question that you just asked about what value were people placing on this package, absent the business opportunity is not very much. But it's not nothing. And so maybe that means that there's what the court needed here to support its finding regarding its conclusion regarding the pyramid scheme. But isn't this going to cause a lot of problems when we start talking about damages? I mean, I'm really struggling with damages in this case. Yes, Your Honor. If you're saying it's going to cause a problem because this court would want to accord some value to the item. Well, there's some assumptions built in that seem really problematic. To the court's existing equitable monetary relief. Right. Right. I think what I would say, and we got into a lot of granular level detail there, but I think what the court was trying to do was to reflect in its award these non-moguls, I'm speaking very precisely here, these non-moguls who presumably purchased these packages because they saw value for the included items, and to then use that figure as a way of cutting down the award from just an assumption that every single mogul must not have wanted these products. Because some of them placed some value. So the assumption there is that the same number or percentage of folks who placed some value. We're back to one album, right? Yes, Your Honor. We're back to one album. I understand. That's exactly right. All right. And to be clear, I mean, the district court did say it hedged its language a little bit. I mean, it said it was of no value to those who were purchasing it for the business opportunity. It did say, on the other hand, it was of extremely limited value to some people who may have found some value in the items included. And at one point it did say that these products, these packages and included items are not a complete sham was the word that it used. So I think in that regard, you can use those kinds of findings in order to support the district court's monetary award in this case. But ultimately, again, when we're talking about the value of these items with these product packages, that's not an issue that is really directly relevant to Byrne Lounge's liability as a pyramid scheme. What is directly relevant to Byrne Lounge's liability as a pyramid scheme is how they structured their business and how they did their reward. And those clearly favored the sale of packages over the sale of music. Your Honor, I realize I'm quite over my time. If I could just have two minutes to make a point. Two minutes to make a point. If the FTC also raised on cross-appeal the individual monetary relief imposed on Defendant Robert DeBoer, we did so because we felt that the district court must have gotten tired by the time it got to the end of its opinion and made some errors with respect to calculating. It's inconsistent. It is inconsistent, Your Honor. The district court clearly wanted to give Mr. DeBoer some breaks. It had not given Mr. Taylor. Those breaks are not consistent with precedent in this circuit. FTC precedent, FTC precedent. And we would urge that this court reverse that aspect of the district court's opinion, but otherwise affirm on all other grounds. And with that, if there are no further questions, I will submit. Thank you. Thank you. Your Honor, thank you. Just briefly, this is a question of failure of proof. And respectfully, Judge Christin, the evidence that has been submitted in support of the liability of pyramid finding does not comport with the COSCA test. The COSCA test says sales commissions paid unrelated to product sales. I'm sorry. Where do you get the word completely? You're reading in completely. I'm reading in. It's either related or it's not related. If it has some relationship, then it is related in part to product sales. The test, the wording of the case doesn't say. Why couldn't it denote the fact that the payment is for a combination of product sales and recruitment opportunity and much more if it is for the recruitment opportunity than for the product sale? It's not a huge chunk if it is unrelated to the property sale. Why is that good enough? Let's assume there are a lot of people that fit exactly in that category, people who have a substantial interest in the business opportunity and some curiosity or some slight interest in one or more of the products in the product packages. That's a very likely scenario which the district court did not address and, most importantly, is no different than every other multilevel marketing company in the country. There is nothing wrong with I'm sorry, Your Honor. There's nothing wrong with incentivizing recruitment. What is wrong is paying commissions to signing somebody up. But if I sign you up and you up and you up and you up and I tell you what a great business Burn Lounge is and you go out there and sell products and I get commissions on that, there's nothing wrong with that business model and that is many of the most basic consumer product companies in this country. So, to, and Judge Gross on some of your questions. My understanding is that that is precisely what is regarded as an ultimately fraudulent pyramid scheme because it's going to collapse and the fact that there is a small connection to a product in which there is minor interest doesn't, I gather, and I'm not a mathematician and I haven't run the numbers, doesn't interfere with the fact that you have this vastly expanding base and it collapses. If people are not, if there aren't people who are mainly interested in the product and are buying it for that reason. When you phrase it that way, Your Honor, now I would agree with what you said. In order for a multilevel marketing company to be a legitimate company, it needs to have a product base that creates a supply, a tested and demonstrated supply and demand for the products. Now, if that is coupled with the business opportunity, that comports with Costco and there is nothing in the case law right now that says predominant interest or what the case law right now says is commission, a pyramid is when commissions are unrelated to sales of products to the ultimate consumer and this court, the district court, made findings that these product packages, unlike these Federal Trade Commission's contention, were legitimate products. Nobody except the FTC said that music downloads or burn lounges are only ostensible products. That is a characterization, a litigation characterization that is not found in the record. So, if you accept that the product packages are products at a tangible value, they're going to have different values to different people. Just one example, Your Honor, one of the most important products was a pass to Live Nation Concerts. Now, my daughter who happens to be sitting back there, she's from New York, she's a real music fan and she loves going to Staples Center for Concerts and Live Nation has what's called a concert seating where there are no assigned seats for some of these concerts. If my daughter had a burn lounge VIP pass, she could go to the front of the line, get in before the crowds, pick her seat and an intermission go behind the ropes. That was one of the products of the VIP product package. To say that that product, that that's not a product, that it has no value, that it doesn't create the market, that at least for some people would create the supply and demand that makes a multi-level marketing company not a pyramid, that's just crazy. And the fact is, it was the Federal Trade Commission's burden of proof to come in and put on evidence, and if it has to be surveyed, so be it, there might be other ways of proving it, that the people who were buying those product packages bought it only for the business opportunity and I'm very happy to adopt the predominance test, if that's what this court's opinion is going to do is to refine COSCID or Omnitrition to talk about the predominant motive. In fact, NY actually does that, Your Honor. If you look at the NY decision when it discusses COSCID, it talks not in not as black and white terms as COSCID or Omnitrition, it actually talks about the need for a market and an important part of the purchase decision, but we're the defendants. They have the burden of proof of showing that these were illegitimate sales and that they shouldn't be counted as sales to ultimate consumers, and the fact of the matter is, there's no dispute that these were products that had some value to some people that this court so found, and they were sold to the ultimate consumers of the product. That's the state of the law today, and that's the state of the law that we argue in the district court, and even if this court refines it with some kind of predominant intent test, if it refines Omnitrition and that becomes a law going forward, the Federalist Faith Commission does not meet its burden of making that proof in this case. Thank you very much. Well, tell me, how did the folks that got started with this and bought the product, bought the package for the $400 and some odd dollars, how did they make their money? Well, some of them, again, short question, slightly complicated answer. Some of them didn't try to make money. Isn't the answer to that 93 or so percentage of them didn't make any money? No, Your Honor, because it all depends on how you define a winner and a loser. The FTC sets the stalking horse, you know, in order to find if you're a winner or a loser, you need two pieces of the map, and this is sixth grade math, which I can do. Judge Wu's math is another subject. You need the investment. How much did you invest, and then how much did you get back? If I go and buy consumable products for the purpose of consuming them, that's not an investment in the business opportunity. The only, this is actually a very important point, and I want to thank you for allowing me to make it, the only revenue that came to Byrne Lounge, which was unrelated to product sales, was the $6.95 monthly mobile fee, and that revenue, which came into Byrne Lounge, was not commissionable. All of the other revenue in one extent or another was related to the sales of products, and I grant you that some people are going to like music videos that came every month in the mail better than other people, but that doesn't make them illegitimate products, and Judge Barzahn, to get back to what I think you challenged me on a few minutes ago about the difference between a legal business and a pyramid that's going to collapse on itself, the fact of the matter is there's no evidence in the record other than Dr. Vannen's theoretical geometry, you know, true to the eighth power, there's nothing in the record to show that this particular business was not product-driven, and, in fact, there is something in the record, and I can supply the court with a letter if I think it should be briefed. The revenue that came into Byrne Lounge were sufficient to pay the cost of the products and the commissions. Just by the sale of the products. Right. They were sufficient for now, but they weren't going to be sufficient longer. Well, no, Your Honor. It's a moving target. As the customer base of Byrne Lounge expands, the revenue is going to expand. And, by the way, the percentages that Mr. Kapler pointed out about people who were participating in a business opportunity by paying mobile fees and people who weren't, those statistics are all skewed by defining what the investment in the business opportunity is, and if you don't load the equation by counting the whole $430 as the investment in the business opportunity, then all of those statistics get changed. And the district court tried to have it both ways. It said that the product package had some tangible value to some people, but then it gave no credit for it, and in the liability side, Judge Christian, he counted that as bad sales, and that's not fair because there's no evidence, one way or another, that those were not legitimate sales. And that's a failure of proof. And the Federal Trade Commission in the future, when it comes in to sue a multilevel marketing company, we believe needs to prove that it either had sham products, fake products, you know, we call it a product, but it's really not, or that there was no assurance that those products would end up in the hands of the ultimate consumer. There is no published decision, and this court, if it affirms the district court, will be the first. There is no published decision holding a multilevel marketing company to the illegal pyramid where there were real products that were sold to the ultimate consumer of those products. And I would just say that this is not a record that would sustain that kind of finding. I'm sorry, Your Honor. If you had a mogul that was third level down, how did money get to the mogul? Well, if that mogul sold products, then commissions were paid pending upon- Packages. I'm sorry? Pending packages, right? Products, merchandise, product packages, music, T-shirts, VIP passes, a whole variety of things, Your Honor. But yes, largely product packages. By the way, Byrne Lounge, one month after the FTC shut them down, was scheduled to release movies and MP3 plays. Contracts. This is in the record. You're way over time. I was just answering. I'm sorry. The way they got the money, Your Honor? The way they got the money is commissions were paid. And depending upon- Products. On product sales, yes. On sales. On product sales. And nothing else. Nothing else. Decreasing percentages, by the way. If I signed you up, I would get a larger percentage of your sales. And if you signed Judge Kristen up, I would get a smaller percentage, like any sales company. Why don't you just look at somebody else when you do that? I'm sorry? Look at someone else. Oh, I apologize. I'm sorry. I didn't mean to do that. I'm just saying that, yes, commissions were paid on product sales. At my age, I'd only buy green bananas. So I'd like to know, how does the money get to the top? Commissions on product sales only. Only. Only. And what happens to the money that's paid to become a mogul? It goes to Byrne Lounge for its general administrative costs and product development. And is that whether it's a small amount of money or a large amount? Well, the mogul fee is $6.95 a month. What about when you buy something that costs $4 or $5 million? What happens? All the money goes to Byrne Lounge. All the money goes to Byrne Lounge. Some of it is then sent back as commissions. Some of it is paid in salaries and overhead. So what's the point in anyone becoming a mogul at the lowest price? The point of someone becoming a mogul, if they were interested in the business? Is that the question, Your Honor? If they were interested in the business. If I became a mogul and I signed up my wife, is that safe? That may not be safe. She's been living with this case for seven years, Your Honor. It's safe. If you take your chance. Do they get commissions on the local fees? No. That's actually a critical part of the business structure. And that was done with the advice of legal counsel to comply with COSCOT. Because COSCOT doesn't allow commissions to be sold unless they're related to product sales. The mogul fees is the only revenue stream that came to Byrne Lounge that was not related to product sales. Then what did Byrne Lounge do with that money? Well, the first few years it lost money like any startup company, Your Honor. But it paid $15 million in commissions to its distributors. It paid $6 million to record companies to license legal music. It paid hundreds of thousands of dollars to Live Nation so it could give its members those passes. It paid hundreds of thousands of dollars to a company called Orbital Publishing to publish a very fine magazine. Which, by the way, did not promote the business opportunity. That magazine was a music industry magazine. The only thing in that magazine that talked about the business opportunity was a one-page insert in the middle. The rest of it was interviews with artists.  And this company was exciting. You know, we now have all these Facebooks and things like that. This was at the inception. This was a place for music fans to share their music, to get exposed to new music products. And if they wanted to, to try to develop a home business and make a little bit of money on the side. Your Honor, you've been very patient. I'm sure it's lunchtime. Thank you very much. Oh, no. We're just hungry for knowledge. All right. It's been an interesting discussion. Thank you. And we'll adjourn.
judges: Pregerson, Berzon, Christen